### NEWELL A. THOMPSON & another *vs.* PATRICK KELLY.
### PATRICK KELLY *vs.* NEWELL A. THOMPSON & another.

An auctioneer, employed to sell real estate on terms which contemplate the payment of a deposit into his hands by the buyer at the time of the auction and before the completion of the sale by the delivery of the deed, may sue for such deposit in his own name whenever an action for it separate from the other purchase money may become needful.

A house fitted only with cold water was advertised in the newspapers to be sold by auction, as fitted with "hot and cold water," and subject to examination at any time before the sale, the keys, terms and further particulars to be obtained on application to the auctioneer.   At the auction, the auctioneer read from a paper the terms of sale; announced that there was an error in the advertisement, as the house was not fitted with hot water; and then offered the house for bids, when it was bid in by a person who, having read the advertisement in the newspapers but not examined the house nor applied to the auctioneer, had come to the sale, but arrived after this announcement.   The auctioneer then presented to the buyer the paper from which the terms of sale had been read; and the buyer signed it without fully reading it.   At the top of this paper was pasted a copy of the advertisement, cut out of a newspaper, from which the words "hot and " were erased. Then followed a recital that the buyer acknowledged purchasing "the estate set forth in the above printed advertisement " for a sum specified, and agreed to comply with " the terms of the sale as stated by the auctioneer and hereto annexed," and, " having paid into the auctioneer's hands        dollars, agreeably to said terms," agreed "to forfeit said sum to the use of the seller " in evont of failing to comply with the residue of said terms.   It was to this recital that the buyer signed his name, and, at the time he did so, he did not observe or know of the erasure in the copy of the advertisement pasted above. Then followed, on the paper, a recital, which the seller signed, to the effect that he confirmed the sale.   And below all was a "memorandum of the terms and conditions of sale," in which, after specifying how the sale might be altogether avoided in event of a defect of title, it was provided as follows: " The purchase money to be paid in cash on

delivery of the deed." " Two hundred dollars to be paid down into the hands of the auctioneer to bind the bargain, and to be forfeited to the use of the seller in case the purchaser shall fail to comply with the residue of the terms of sale, or refunded to him in case of a material defect in the title. But a forfeiture of said sum shall not release the purchaser from his liability under this contract." " Settlement to be made and deed to be delivered at office of auctioneer at or before the expiration of ten days." After signing the paper, the buyer asked the auctioneer for the keys, to look at the house, saying that if the house was all right he would pay the two hundred dollars within an hour; and the auctioneer delivered them to him. On examining the house and discovering that it was not fitted with hot water, he returned the keys to the auctioneer, informed him that he should not take the house, and refused to pay the two hundred dollars; whereupon the auctioneer advertised the house for sale " on the account of " said buyer, and sold it for thirty dollars more than the amount of his bid. *Held*, that in the absence of fraud the first buyer was bound by his contract. *Held*, *also*, that the auctioneer might maintain in his own name an action for the two hundred dollars, without regard to the extent of his lien thereon, and without deduction on account of the surplus of thirty dollars realized at the second sale.

THE FIRST CASE was contract, by auctioneers in Boston, alleging that the defendant bought of them a parcel of real estate, and made an agreement with them, in writing, to pay them two hundred dollars down to bind the bargain, but, though often requested, neglected and refused to pay the same, and owed them that sum, with interest. A copy of this agreement, annexed to the declaration, was as follows, the first paragraph of it, as printed below, being a slip cut from a newspaper, with an erasure between the words "gas" and "cold":

" Brick Dwelling-house on Dwight Street. On Friday, October 5, at 3 o'clock, P. M., on the premises. The 3½ story brick dwelling-house No. 12 Dwight Street, containing 11 rooms, with gas, ~~~~~~ cold water fittings, &c., and is in good repair. Will be sold without reserve upon favorable terms of payment. May be examined at any time before the sale. For key, terms and further particulars, apply to the auctioneers.

" Boston, October 5, 1866. I hereby acknowledge to have this day purchased by public auction of Newell A. Thompson & Co., auctioneers, the estate set forth in the above printed advertisement, for the sum of fifty-nine hundred and fifty dollars and I agree to comply with the terms of the sale as stated by the auctioneer, and hereto annexed; and, having paid into the hands of the auctioneer the sum of                    dollars agreeably to the said terms of sale, I hereby agree to forfeit said sum

to the use of the seller, should I fail to comply with the residue of said terms. Patrick Kelly.

" The above sale is hereby confirmed.

" Robert S. Garrett, for the heirs of Robert Garrett.

" Memorandum of Terms and Conditions of Sale. One week to ten days given to examine title, and if upon examination of the records it shall appear that any material act or thing is necessary to be done or performed, in order to perfect the title to said premises, which the seller is unable to do or perform within a reasonable time, not exceeding twenty days from the date hereof, then the sale to be void at the option of either party. Purchaser to pay one half of the taxes for the current year, as assessed on May 1, 1866. Property sold subject to no existing mortgage. The whole amount of the purchase money to be paid in cash on delivery of the deed, or at the option of the purchaser one third in cash and residue in one and two years, with interest at six per cent. per annum payable semiannually, secured by power of sale mortgage on premises. Two hundred dollars to be paid down into the hands of the auctioneer to bind the bargain, and to be forfeited to the use of the seller in case the purchaser shall fail to comply with the residue of the terms of the sale, or refunded to him in case of a material defect in the title which cannot be remedied as above provided. But a forfeiture of said sum shall not release the purchaser from his liability under this contract. Rents and interest to be made square to the day of delivery of deed. Settlement to be made and deed to be delivered at office of auctioneer at or before the expiration of ten days from day of sale."

The answer admitted that the defendant signed this agreement, but alleged that, if he owed any one under it, it was the heirs of Robert Garrett, and not the plaintiffs; that he signed it under a mistake and false representations, in that, by the terms of the printed advertisement, the plaintiffs offered the house for sale as having both hot and cold water fixtures, when in fact it had no hot water fixtures, and in that, by the terms of the agreement which he signed, it was provided that the house had hot water fixtures; that, if he owed anything, it was only

for such damage as the plaintiffs had actually suffered; and that nothing could be recovered from him, inasmuch as the blank in the agreement signed by him was left unfilled.

Trial in the superior court before *Devens*, J., who made a report thereof as follows:

"At the trial, McClellan, one of the plaintiffs, testified that the plaintiffs were auctioneers, and as such had advertised for sale the premises described in the agreement declared on, and that the advertisement, as it appeared in the newspapers, stated that the premises had hot and cold water fittings; that the agreement, afterwards signed by the defendant, was drawn up in the plaintiffs' office, on the morning of and before the sale. and that, having ascertained that the premises had no hot water fittings, the words "hot and" were erased from the advertisement, which was cut from a newspaper and attached to the agreement and made a part of it. At the auction, Thompson, who made the sale, announced the terms upon which the sale would be made, reading from the agreement, and announced that the advertisement contained an error, as there were no hot water fittings in the house. The bidding then commenced, and the premises were knocked down to the defendant. The agreement was then executed by the defendant and Garrett. The defendant then said he had not the two hundred dollars with him, but would go to the store and get it, and meet the witness at the office of the plaintiffs and pay it. The witness locked up the house and gave the keys to the defendant, and walked with him part of the way to the plaintiffs' office, when the defendant left to go and get the money, but did not come to the office, nor did the witness see him afterwards, nor was the money ever paid, although the keys were sent to the plaintiffs' office. The witness did not know whether the defendant was present when Thompson announced the terms of sale; did not see him until he came forward to sign the agreement; and did not recollect whether the defendant read the agreement before he signed it, although he had the opportunity of doing so. The plaintiffs then put in evidence the agreement, under the defendant's objection.

" The defendant testified that he read the advertisement as it appeared in the newspapers, and went to the sale; that he did not arrive until after the sale had commenced, and did not examine the house, and did not hear the statement that there were no hot water fittings; that he bid off the house at the price named in the agreement, and signed the paper with his pencil, the papers being held up against the wall by McClellan; that he did not read the whole of the papers, and did not know that the words " hot and " had been erased from the printed advertisement, which was pasted on the top of the papers he signed; that he walked down with McClellan and asked him for the keys, that he might look at the house, and told him if the house was all right he would come up in an hour and pay the two hundred dollars; that he did look at the house and found it had no hot water fittings, and returned the keys to the plaintiffs' office, and informed them that he should not take the house. This closed the defence.

" McClellan was again placed upon the stand, and denied that the defendant asked him for the keys, or that he said he would look at the house and if it was all right would come up in an hour and pay the two hundred dollars, but testified that he gave the defendant the keys as the purchaser, and that what the defendant said when he left him was, that he would come up in the course of an hour and pay the two hundred dollars. On cross-examination, the witness testified that (Kelly having refused to comply with the conditions of the sale) the plaintiffs had advertised the house and sold it on the account of Patrick Kelly, the defendant, at which sale it brought thirty dollars more than the defendant had bid for it at the time of his purchase. This was all the evidence in the case.

" Upon these facts the judge ordered a verdict *pro formâ* for the plaintiffs, which was rendered, and by request of the parties reported the case for revision, that judgment might be entered upon the verdict or a new trial ordered, as the supreme judicia court should determine."

*C. R. Train,* for the plaintiffs.

*L. Child & L. M. Child,* for the defendant.

WELLS, J.　The report does not state what questions were intended to be presented to this court. The defendant was clearly entitled to go to the jury upon the testimony. But he makes no point, in the argument here, that he was wrongly deprived of that right. We assume, therefore, that the verdict was ordered for the plaintiffs with his assent; and that he did not desire to argue to the jury upon the force of the testimony.

We cannot undertake to decide questions of fact. We can only take the testimony as reported, giving it full effect so far as uncontradicted, and, in all points of disagreement, assuming that of the defendant to be true; and if, upon the testimony so considered, there appears to be a *primâ facie* case for the plaintiffs to which there is no legal defence shown, the verdict must stand.

No question is made upon the pleadings. The two principal questions, presented for our consideration, are: 1st. Whether the action can be maintained in the names of the plaintiffs. 2d. Whether the mistake, under which the defendant signed the memorandum of sale, was such as entitled him to repudiate the purchase.

1. In case of personal property, an auctioneer, employed to sell, may ordinarily maintain an action for the price, or for the property itself. Chit. Con. (10th Am. ed.) 252. 1 Chit. Pl. (6th ed.) 7, 8. Story on Agency, §§ 27, 107, 397. *Tyler* v. *Freeman*, 3 Cush. 261. This doctrine stands upon the right of the auctioneer to receive, and his responsibility to his principal for, the price of the property sold, and his lien thereon for his commissions; which give him a special property in the goods intrusted to him for sale, and an interest in the proceeds. In case of real estate, he can have no such special property, and would not ordinarily be held entitled to receive the price. But when the terms of his employment, and of the authorized sale, contemplate the payment of a deposit into his hands at the time of the auction, and before the completion of the sale by the delivery of the deed, he stands, in relation to such deposit, in the same position as he does to the price of personal property sold and delivered by him. He may receive and receipt for the deposit

his lien for commissions will attach to it; and we see no reason why he may not sue for it in his own name, whenever an action for the deposit, separate from the other purchase money, may become necessary.

In this case, if there was an effectual sale, the amount of the deposit, due by its terms, not having been paid at the time, there is an implied promise to pay it. That promise enures to the benefit of the party legally entitled to receive the deposit. It is not merged in the written agreement, because that writing clearly excludes it as a matter already otherwise provided for. There is also a subsequent express promise to pay the amount, coupled only with the condition "if the house is all right." The defendant does not deny that the house was "all right," except in the particular upon which he seeks to defeat the entire sale.

The memorandum is sufficient to take the case out of the statute of frauds.

The plaintiffs, it is true, are not parties to the written instrument. But they do not sue, and it is not necessary that they should sue upon the writing. The obligations in relation to the deposit are outside of that, and are so recognized by the writing itself.

2. The mistake, for which the defendant seeks to avoid the contract of sale, was not occasioned by any fault of the plaintiffs. It did not affect the identity of the property which was the subject of the sale. The error in the advertisement does not appear to have been otherwise than in good faith, and was corrected and explained when the property was offered for bids. The defendant, without previously examining the property, and not having been present at the opening of the sale, when statements and explanations in relation to the property offered might reasonably be expected to be made, took no precaution to inquire, but relied wholly upon the published advertisements. He contented himself with reading a part only of the memorandum which was placed before him for signature, and which exhibited the modification in the description of the property, by an erasure of "hot and" from the printed advertisement attached. It does

not appear that the plaintiffs, or Garrett, in any way conducted so as to mislead him, or induce him to forego scrutiny or inquiry; nor that either of them knew, or had reason to suppose, that he was thus misled, or that he was not present when the alteration of the advertisement was explained. Upon his own statement, we do not think he makes such a case of mistake as entitles him to be released from his contract.

*Judgment on the verdict.*

After this decision, the defendant filed in this court a petition for a review, which was heard by *Wells*, J., and reserved for the determination of the full court as follows :

" The grounds of the petition are, that the verdict was rendered under a misapprehension of the petitioner's counsel as to its effect, and as to the manner in which the objections intended to be raised against such verdict would be presented to the supreme judicial court upon said report. Upon a hearing of the parties on said petition, I am satisfied that there is no sufficient ground for the review prayed for, unless it be upon the question of damages. Upon that question, if there be any ground in law, upon which the petitioner could have reduced the damages, upon the facts or testimony stated in the report, or if the plaintiffs in the original action were entitled to recover, under the circumstances stated, only to the extent of their lien upon the deposit money, I am satisfied that the petitioner has, without culpable fault on his part, failed to have an opportunity to make such defence and obtain such reduction, and is therefore entitled to a review of said action for that purpose. The question whether, upon the facts and testimony so stated, such defence .n mitigation or reduction of damages would be open to the petitioner in said action, I reserve for the consideration of the whole court. If such defence would be open, the review is to be granted as to the question of damages only; otherwise the petition is to be dismissed." This case was argued at the March sittings 1870.

*L. M. Child*, for the petitioner.

*C. R. Train*, for the respondents.

AMES, J. When the petitioner signed the written agreement at the auction, he must be taken to have understood that he was to pay the sum of two hundred dollars into the hands of the auctioneers. We have decided that his promise to pay that sum was binding upon him, and that they are entitled to maintain an action upon it in their own names. The money when paid was not to be held merely as collateral security against any loss that might arise from a failure on his part to complete the purchase; neither was it a deposit which he could reclaim. It was to be a *payment*, "to bind the bargain." It was to be a payment of part of the price, not to be refunded except in the event (which is not suggested in this case) of a material and irremediable defect of title on the part of the seller. It was to be a payment on account, in which the bidder was to part absolutely with his money, and of which, if there should be no difficulty with the title, he could have the benefit by having it allowed on final settlement at the delivery of the deed, and in no other way. When a purchaser expressly stipulates that a payment on account, actually made by him, is to be forfeited if by his own fault the purchase shall not go into effect, he may reasonably be understood to mean that it shall not be reclaimed in whole or in part. The distinction between a penalty and liquidated damages does not apply to a case of that description. If the money had been paid to the auctioneers, they would have received it only as agents for the seller. It is because they gave credit to the petitioner at his request, and relied upon his express promise to place the amount in their hands at an early day, that they are entitled to maintain their action against him.

On the refusal of the petitioner to comply with the conditions of the sale, the property was advertised and sold "on the account of Patrick Kelly." But there is no reason for saying that it was sold as his property. It did not belong to him, and no title was expected to be derived from him. In one sense it was sold on his account; because, if it brought a less price than the amount for which it had been struck off to him, it would have furnished a measure of the loss resulting from his failure to fulfil the conditions of the first sale. One object of the sale was

to settle that question, and the form in which it was advertised and sold must be considered as intended to reserve the right to fall back upon Kelly if the second sale should result in a loss. As there was no loss, he is relieved of all liability on that score. His right, however, to recover back money which he had voluntarily paid on account, and which was put in jeopardy only by his wrongful refusal to fulfil his contract, would derive no support from anything connected with the second sale. His right to resist the enforcement of his promise to pay the two hundred dollars is no better or stronger than would be his right to reclaim the money, if it had been paid in at the time when he signed the agreement. For these reasons, our decision must be that the

*Petition is dismissed.*